(C. D. 1590)

COLES CRANES, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 24, 1954)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action arose at the port of Philadelphia and invokes our jurisdiction pursuant to the provisions of section 514 of the Tariff Act of 1930 (19 U. S. C. § 1514). We are asked to consider and determine the dutiable classification of an importation from England which is described in the record as "mobile cranes."

The collector of customs classified the cranes pursuant to the provision in paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, as other machines, finished or unfinished, not specially provided for, and duty was imposed thereon at the rate of 15 per centum ad valorem.

Plaintiff relies primarily upon the claim in its protest that the articles should have been classified as "Automobile trucks" in accordance with the terms of paragraph 369 (a) of said act (19 U. S. C. § 1001, par. 369 (a)), as modified, *supra*, and subjected to duty at the rate of 12½ per centum ad valorem. Alternative claims of plaintiff

are that the articles should have been classified within the provisions of paragraph 369 (b) of said act (19 U. S. C. § 1001, par. 369 (b)), or in accordance with the terms of paragraph 369 (c) or 353 (19 U. S. C. § 1001, par. 369 (c) or 353) of said act, as modified, *supra.*

The pertinent portions of paragraph 372 of the Tariff Act of 1930, as modified, *supra,* applied by the collector of customs, read:

Machines, finished or unfinished, not specially provided for:

\*    \*    \*    \*    \*    \*    \*

    Other \* \* \*_____ 15% ad val.

The various provisions invoked by plaintiff, so far as applicable here, read as follows:

Paragraph 369 (a), as modified, *supra:*

Automobile trucks valued at $1,000 or more each, automobile truck and motor bus chassis valued at $750 or more each, automobile truck bodies valued at $250 or more each, motor busses designed for the carriage of more than ten persons, and bodies for such busses, all the foregoing, whether finished or unfinished_____ 12½% ad val.

Paragraph 369 (b) of the Tariff Act of 1930:

All other automobiles, automobile chassis, and automobile bodies, and motor cycles, all the foregoing, whether finished or unfinished, 10 per centum ad valorem.

Paragraph 369 (c) of said act, as modified, *supra:*

Parts (except tires and except parts wholly or in chief value of glass) for any of the articles enumerated in subparagraph (a) or (b) of paragraph 369, Tariff Act of 1930, finished or unfinished, not specially provided for:

\*    \*    \*    \*    \*    \*    \*

    Other_____ 12½% ad val.

Paragraph 353, as modified, *supra:*

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, \* \* \*:

\*    \*    \*    \*    \*    \*    \*

    Internal-combustion engines:

        Carburetor type_____ 10% ad val.

        Other, of the horizontal type and weighing not over 5,000 pounds each, or not of the horizontal type and weighing not over 2,500 pounds each_____ 10% ad val.

The sole witness in the case was George Bassnett, president and general manager of the plaintiff company, who appeared to be well qualified to testify regarding the design, character, structure, and use of the imported cranes, having handled and operated them in this country for 3½ years, and from 1942 to 1948 had been engaged in selling them in England.

Bassnett identified exhibit 1 as illustrating a crane known as "Coles Model 8505-2, 7½ ton mobile crane" being the same model number as the one described on the invoice as "Model 8502/2 6 ton Model Petrol Electric Crane with 21′9″ Jib," the two cranes differing only in size.

Exhibit 2 illustrates the imported crane described on the invoice as "Model 8506 1 ton Mobile Petrol Electric Crane," except for size.

Exhibit 3 was received in evidence as a photograph illustrating how one of these cranes may be used for lifting boxcars.

It would appear from the illustrations in exhibits 1, 2, and 3, that the imported cranes are in outward appearance like those commonly seen in our daily life wherever heavy construction work is in progress. One end of the boom through which the hoisting cables operate is partially enclosed in a cabinet which rests upon a circular plate—permitting a turning circle of 360°—securely fastened to a firm, steel chassis mounted upon rubber-tired wheels. The cabinet contains the power unit—a gasoline Ford V-8 industrial engine—a generator, electric motors, and a cab, completely enclosed, allowing full vision to the operator of the controls. The machine is also equipped with brakes, safe-load indicator, electric horn, instrument panel, dashlight, headlamps, side lamps, boom headlamp, et cetera.

Bassnett testified that—

On the crane there are four separate and distinct operations. The first two are the actual lifting of any merchandise or accumulation of merchandise that has to be lifted. The third is the swinging of that merchandise throughout a full 360° and last is the actual travelling of the equipment with the load suspended on the hook over any distance that may be required.

    *      *      *      *      *      *      *

They are designed to travel along the highway with normal automobile type of steering; in other words, with an automobile type steering wheel. They are fitted up with both foot brakes and parking brakes, fitted with a horn and lights which are designed to comply with highway regulations; in other words there is a switch that will dim the lights when approaching oncoming traffic and they have mudguards or wings and they are mounted on rubber tires.

In explaining the method of self-propulsion, the witness stated:

Well, apart from the fact that the transmission is slightly different, it requires an electric motor running into the speed gear box with a prop shaft connection into the rear axle and by depressing the accelerator varying speeds can be obtained.

When asked if the structure has two speeds forward, he testified—

Well, it is rather like an automatic transmission; it has no fully accepted gear box except it has a high speed which is preselected for road travel and a low speed once it is travelling in a defined area.

    *      *      *      *      *      *      *

It also has a reverse.

In describing how the motor functions, he testified—"Briefly the gasoline motor drives a generator which in turn provides electric current for four distinct motors. * * * Electric motors, yes. The electric motor hoist, the boom hoist, swing and travel." The gasoline engine normally in use is the Ford V-8 industrial truck engine.

Bassnett pointed out that "The fact that the crane is mobile and can move from any point increases the value to the user"; it combines the operations of lifting and transporting in one machine. He further stated that "the common nomenclature of this particular vehicle as portrayed on the cover, always specifies that as a truck crane. * * * The accepted expression in the crane industry in this country is that what we call a mobile crane is commonly referred to in this country as a truck crane." He likened this mobile crane to "your break-down truck or wrecker" and that "there is what is called a straddle truck that lifts timbers and steel sections into the belly of the machine"; also, "The truck which has the concrete mixer on the back which is carrying merchandise in a semi-finished condition from one place to another." He distinguished the imported cranes from the stationary type of crane by saying—

Primarily the fact that ours is a self-propelled unit and as such has the mobility to go from any point to any other point, whereas the fixed type are restricted to an area comparable to the size of this courtroom.

It appears also that on the front and rear bumpers of the subject cranes "there are inserted two outrigger tubes with steel sections, on which is attached a lifting jack. The main purpose of that is that if the crane has to lift a load normally in excess of the rated capacity of the crane by putting the fixtures on you will thus increase the capacity."

When asked if mobility was the primary essential feature of the imported cranes, the witness answered—

Not the primary one, but certainly the one that gives the cranes those two advantages.

* * * * * * *

Mobility without the ability to lift would be useless but the ability to lift and then to travel I would then class that as of primary importance.

The salient facts disclosed by the testimonial record, aided by the graphic description of the articles in exhibits 1, 2, and 3, establish that the importation consists of two complete mobile cranes, so constructed that the lifting or hoisting portion of each crane, with its boom which may turn in a complete circle of 360°, rests upon a firm, steel chassis which is equipped with rubber-tired wheels. The two cranes differ only in size. They are powerfully built to lift or hoist heavy loads such as boxcars, steel girders, and other bulky and ponderous products, for instance. It is not disputed that the imported cranes are valued at over $1,000 each.

In support of its claim that these mechanical devices should be classified for duty as automobile trucks, as provided in paragraph 369 (a), plaintiff contends that the merchandise falls squarely within

the common meaning of the term "automobile trucks." Upon this point, the following is quoted from plaintiff's brief:

The adjective "automobile" means self-propelled:

Webster's New International Dictionary (1940)

*Automobile*—adj. Containing means of propulsion within itself; self-propelling; x x x.

Thus, an automobile truck is a truck that contains a means of propulsion within itself or is self-propelled.

It is further contended by plaintiff that the term "truck," as applied to self-propelled vehicles, has come into popular usage during the past 35 or 40 years; that "The Tariff Act of 1922 made no specific provision for automotive trucks, but apparently covered all types of motor vehicles under the general heading of 'automobiles'."

The brief of plaintiff then sets forth lexicographic definitions of the noun "truck":

Funk & Wagnalls New Standard Dictionary (1942):

truck, *n.* **1.** A strong vehicle, variously constructed, especially one with four wheels, for transporting freight, merchandise, and other heavy articles.

Webster's New International Dictionary (1948):

truck, *n.* * * * **3.** Any of numerous vehicles for transporting heavy articles; * * * **5.** A large automotive vehicle for freight transportation.

The Oxford Dictionary (1926):

truck * * * **3.** A wheeled vehicle for carrying heavy weights; variously applied.

Webster's New Collegiate Dictionary (1949):

truck, *n.* * * * **3.** Any of numerous vehicles for transporting heavy articles; esp. * * * **d** Any strong horse-drawn or automotive vehicle for heavy or long-distance hauling.

The following judicial authorities are also cited in support of the foregoing definitions: *Paltani* v. *Sentinel Life Ins. Co.*, 237 N. W. 392, 121 Neb. 447; *Harrison* v. *State*, 210 S. W. 2d 591.

Plaintiff further asserts in its brief that—

* * * it is commonly known that "trucks" include such things as auto or garage wreckers designed and used to lift and carry disabled automobiles * * *; airport tow trucks designed and used to tow grounded airplanes at an airport * * *; cement mixers that mix cement in a revolving drum during a trip from one place to another * * *; straddle trucks used in lumber operations, etc. that, by the use of hydraulic arms, pick up and carry heavy timbers in the belly thereof * * *.

While accepting the definitions above quoted as reflecting the common meaning of the term "truck," we can not agree with plaintiff that "the merchandise under protest falls squarely within this well-understood common meaning."

Although the term "truck" connotes a strong vehicle for carrying or transporting freight, merchandise, or heavy weights, the definitions above quoted convey to a reasonable mind the idea of an automotive or horse-drawn vehicle primarily designed for carrying or transporting goods, wares, and merchandise from relatively remote points at varying rates of speed.

While it is true that the subject cranes are equipped with gasoline engines, electric motors, lights, horns, brakes, et cetera, which enable them to be self-propelled along a highway at a very slow rate of speed—said to be 4 or 5 m. p. h. loaded and traveling on level ground—we think the inference is clear from the record that when the crane is "loaded" it travels merely for the purpose of transferring a ponderous load from a lighter, railroad car, truck, or loading platform, to some other nearby point. In other words, these cranes *transfer* rather than transport objects from one point to another. It staggers the imagination to conceive of cranes like those in controversy utilizing the streets or highways for the transportation of huge girders or boxcars.

It is our considered opinion, therefore, that the mobile cranes in controversy here are not automobile trucks within the meaning of paragraph 369 (a), *supra*, and by the same token they are not automobiles within the meaning of paragraph 369 (b), *supra*.

Support for the foregoing conclusions is found in the following cases cited by counsel for the parties: *American-La France Fire Engine Co., Inc.* v. *Riordan* (C. C. A. 2d), 6 Fed. (2d) 964; *Paltani* v. *Sentinel Life Ins. Co.*, 237 N. W. 392, 121 Neb. 447; and *People* v. *P. T. Cox Const. Co.*, 15 N. Y. S. 2d 756.

In the *American-La France* case, the collector of internal revenue had imposed an excise tax upon the manufacturer of motor-driven fire apparatus pursuant to the provisions of statutes which provide for the imposition of excise taxes upon automobiles, automobile trucks, automobile wagons, et cetera, equivalent to 3 per centum of the price at which they were sold by manufacturers, producers, or importers. As stated by the court in its opinion—

The questions presented are: First, whether fire apparatus, as described, sold to the state or political subdivision thereof for use in carrying on its governmental operations, is subject to this excise tax; and, second, whether self-propelled fire engines and other species of self-propelled fire apparatus as referred to in the complaint are taxable under either statute as automobile trucks or automobile wagons.

The court found it unnecessary to decide the constitutional question, but it was clearly of the opinion that fire engines are not taxable as "motor trucks." Upon this phase of the case, the court observed:

We should consider, first, whether or not these instruments or apparatus are instruments for fire fighting, or automobiles and motor wagons within the meaning of the two statutes in question. The etiology of fire engines is distinct from

pleasure automobiles and commercial trucks. Fire engines, as such, have been referred to by that name for at least 200 years. They are referred to in the ancient statutes of England and the colonies of the United States and in the resolutions of city common councils passed before the adoption of the Constitution. * * * Therefore it would seem that the manufacture of self-propelled fire engines did not branch off from the manufacture of pleasure automobiles and commercial trucks. The fire engine existed long before the automobile, and even the self-propelled fire engine had developed to a considerable degree of efficiency prior to the modern development of the automobile. * * * These factors and point of view of origin go far in determining that the self-propelled fire engine is an entirely different instrument from the automobile truck.

Further, the court said—

* * * An automobile truck is a vehicle for the conveyance for commercial purposes over ordinary roads, and the average type of that kind of vehicle is especially designed both in its propelling mechanism and in its body construction for that function.

The court then pointed out that a fire-fighting machine is a one-utility machine used exclusively for putting out fires; that "In the commercial truck or pleasure automobile, the basic and sole consideration is to apply motor power and transmission parts for propelling the vehicle along the road. In the design of the fire engine it is entirely different; the main basic consideration is the design of the pump and the motor to propel the pump when it is decided what capacity shall be pumped, and then design the pump transmission and the motor of the appropriate size and proportion to give that definite capacity which is fixed beforehand."

The court then added that—

* * * The transportation of the machine is a secondary consideration. Indeed, the road work requirements are different than those of the commercial truck. It requires greater speed and usually a shorter haul. Thus the fire engine propels itself, its crew, and its equipment. Its runs are short and rapid. It possesses control mechanisms that are entirely absent from trucks.

While the factual bases of the two cases differ, nevertheless, the rationale of the *American-La France* decision lends its appropriate application to the case at bar.

In the *Paltani* case, *supra*, it appears from the syllabus of the court that a touring car, from which the body had been removed, a cabin placed on the front with a small box for holding tools, back of which was attached a hoisting device for lifting derelict automobiles for the purpose of repairs or being towed along the highway, was not an automobile truck within the meaning of a provision in an accident insurance policy which excluded liability for an accidental injury received while riding in or on an automobile truck. In the course of its opinion, the court cited the *American-La France* case, *supra*, as supporting its views.

We have examined the various cases cited by counsel in addition to those above referred to but find it unnecessary to analyze them in

detail in this opinion. We are satisfied that the claims for classification of the mobile cranes in controversy in paragraph 369 (a) or (b), *supra*, are untenable. Other claims in the protest, which were not abandoned but concerning which no argument has been presented to the court, have been examined and are likewise found to be without merit.

Based upon the record before us and for the reasons assigned above, all claims in the protest are overruled.

Judgment will be entered accordingly.